UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Prem Kumar Bhama,

      Plaintiff,

v.                                      Case No. 08-11560

Mercy Memorial Hospital Corporation,       Honorable Sean F. Cox

      Defendant.

_____/

## OPINION & ORDER

    Plaintiff brought this action against his former employer alleging that he was denied two

promotions on account of his gender, age and national origin.  He also claims that his employer

then terminated him in retaliation for having complained about the discrimination.  The matter is

currently before the Court on Defendant's Motion for Summary Judgment.  The Court heard oral

argument on June 11, 2009, after which it ordered supplemental briefing.  (*See* Docket Entry No.

38).  For the reasons below, the Court shall GRANT the motion.

BACKGROUND

    Plaintiff Prem Kumar Bhama ("Plaintiff") filed this action against Defendant Mercy

Memorial Hospital Corporation ("Defendant" or "Mercy") on April 11, 2008.  Plaintiff's original

complaint alleged two counts: "Discrimination - 42 USC 2000e-2(a)" (Count I); and "Age

Discrimination - ADEA" (Count II).

    On or about September 30, 2008 – during this litigation – Plaintiff's employment was

terminated by Defendant.  Plaintiff then filed a First Amended Complaint that added a retaliation

1

claim.  Thus, Plaintiff now has the following three claims in this action:

• <u>"Discrimination - 42 USC 2000e-2(a)" (Count I)</u>: wherein Plaintiff alleges that, in violation of 42 U.S.C. § 2000e-2, Defendant discriminated against him on the basis of his gender, and national origin;

• <u>"Age Discrimination - ADEA" (Count II)</u>: wherein Plaintiff alleges that Defendant discriminated against him on the basis of his age, in violation of the ADEA; and

• <u>"Retaliation" (Count III)</u>: wherein Plaintiff alleges that, in violation of 42 U.S.C. § 2000e *et seq*., Defendant retaliated against him for filing complaints of discrimination.

Defendant filed its Motion for Summary Judgment on March 12, 2009.  This Court's practice guidelines for motions for summary judgment provide, in pertinent part, that:

a.  The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute.  The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .

b.  In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts.  The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record.  The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.

c.  All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

Both parties complied with the Court's practice guidelines for motions for summary judgment such that: 1) along with Defendant's motion and supporting brief it filed an "Amended Statement of Undisputed Facts" ("Def.'s Stmt.") and 2) along with Plaintiff's Response, Plaintiff filed his "Counter-Statement of Disputed Facts" (Pl.'s Stmt.").

The following material facts are gleaned from the parties' statements and the evidence

2

submitted by the parties.

Plaintiff is a 67 year-old male of East Indian descent.  Plaintiff began working for Defendant in its Imaging Department in 2004.

At the time of his hiring by Defendant, Plaintiff was supervised by Chief Technologist Sridhar Iyengar ("Iyengar").  (Def. and Pl.'s Stmts. at ¶ 2).

In January 2005, Plaintiff received a "First Warning" for failing "to follow Departmental Protocol associated with the inappropriate mixing/diluting of Choletec Kit radioscope."  (Def. and Pl.'s Stmts. at ¶ 39; Def.'s Ex. 4).  In 2005, Plaintiff's supervisor also disciplined him for not correctly performing a procedure and for commenting to a patient that she would "break the floor" if she were to fall.  (Def. and Pl.'s Stmts. at ¶ 31).

In Plaintiff's 2005 evaluation, the supervisor stated that Plaintiff "must strive to improve and increase communication with fellow techs.  Increase dialogue and overall interactions so his actions are not misconstrued.  Create and [sic] atmosphere were people can approach him more freely to avoid being misunderstood."  (Def. and Pl.'s Stmts. at ¶ 25; Def.'s Ex. 3).  It also stated that "established protocols must be followed even though changes may not be detrimental to the study.  Must follow manufacturer's/Department guidelines."  (*Id*).  Plaintiff's 2005 evaluation stated that Plaintiff's "apparel is sometime out of dress code in regards to color."  (Def. and Pl.'s Stmts. at ¶ 28).

Sometime in 2005, during a corporate reorganization, Defendant terminated the Imaging Department Director, Carl Andersson ("Andersson") and temporarily replaced him with Ray Palmatier who performed Andersson's duties.  (Def. and Pl.'s Stmts. at ¶ 3).  Concurrent to Andersson's termination and as part of the reorganization, Defendant hired Cindy Miller

("Miller") who eventually ran the Imaging Department.  (Def. and Pl.'s Stmts. at ¶ 5).

Miller reorganized the Department and split it into two groups, Special Imaging and Diagnostic Imaging, and created a Manager position to manage each group and a Lead Technologist position to oversee each modality in those groups.  (Def. and Pl.'s Stmts. at ¶ 6).

The Lead Technologists were required, among other things, to have a good working knowledge of leadership techniques and an ability to act as a liaison and to show "leadership skills."  (Def. and Pl.'s Stmts. at ¶ 7).

The Special Imaging Manager was required, among other things, to have good working knowledge of leadership and motivation techniques, ability to work under stressful conditions and an ability to act as a liaison between each area within radiology and all outside customers/department throughout the hospital.  (Def. and Pl.'s Stmts. at ¶ 8).

Both the Lead Technologist and Special Imaging Manager positions required excellent communication skills.  (Def. and Pl.'s Stmts. at ¶ 9).

Plaintiff applied for both the Nuclear Medicine Lead Technologist and Special Imaging Manager positions.  (Def. and Pl.'s Stmts. at ¶ 10).  Defendant allowed Plaintiff to interview for both positions simultaneously.  (Pl.'s Dep. at 79-81).  Plaintiff's interview panel included Miller, Dianna Redman ("Redman") (who had already been selected for the Diagnostic Imaging Manager position, a position for which Plaintiff did not apply), and Human Resources Representative Mike Vallejo ("Vallejo").  (Def. and Pl.'s Stmts. at ¶ 12).

After the panel interviewed the candidates, they collectively discussed and analyzed the pros and cons for each.  (Def. and Pl.'s Stmts. at ¶ 13; Ex. 5 to Def.'s Br., Miller Dep. at 17-18). After deliberation, the panel unanimously chose Erin Wesley ("Wesley") for the Nuclear

4

Medicine Lead Technologist Position.  (Def. and Pl.'s Stmts. at ¶ 15).  Wesley is a Caucasian female who, at the time, was under 40 years old.  (6/11/09 Hearing Tr.).

Ray Palmatier ("Palmatier"), a Caucasian male who is approximately 20 years younger than Plaintiff was ultimately awarded the job of Special Imaging Manager.  (6/11/09 Hearing Tr.).  Palmatier later resigned from the position (Pl.'s Supp. Br., Ex. 5) and it is undisputed that Palmatier was not replaced after his resignation.  Rather the Special Imaging Manager position was eliminated after he resigned.

On or about April 2, 2007, Plaintiff filed an internal complaint with Defendant, asserting that he was wrongfully denied the position of Nuclear Medicine Lead Technologist due to discrimination.  (Ex. 9 to Def.'s Br.).  Defendant's internal Dispute Resolution Committee ultimately denied Plaintiff's complaint on June 11, 2007, and upheld the decision to award the position to Wesley.  (Ex. 11 to Def.'s Br.).

On or about June 28, 2007, Plaintiff filed a Charge of Discrimination with the Michigan Department of Civil Rights.  (Ex. 17 to Def.'s Br.).  Plaintiff indicated that his alleged discrimination was based upon sex, age and national origin and stated as follows:

> I began working for the above named employer in February 2004.  I am currently employed as a Staff Nuclear Medical Technologist.
>
> On February 28, 2007, I received a Performance Evaluation which was significantly lower than my previous evaluations.  On March 29, 2007, I was denied a promotion to Lead Technologist.  The position was given to a younger, white female, with lesser qualifications and less experience than me.  In addition, I have sixteen (16) years of supervisory experience, while she has none.  On the same date, I was denied a promotion to Manager of the Imaging Section.  The position was offered to a younger white male, less qualified than me.  When he refused the position, the search was expanded to outside the hospital, and subsequently the position was eliminated.

5

> I believe that I have been discriminated against by being given a negative performance evaluation, and by being denied promotion, based on my national origin. East Indian, my age 66, and my gender, male, in violation of Title VII of the Civil Rights Act of 1964, as amended, and the Age Discrimination in Employment Act of 1967, as amended.

(*Id.*).

Plaintiff filed this action against Defendant on April 11, 2008.

It is undisputed that during a three-month period from July through September, 2008, Defendant received several complaints from patients about Plaintiff. "The first of those occurred on July 29, 2008, the second of those occurred less than one week later, on August 4, 2008. Plaintiff was warned and coached as to each of those incidents. On September 25, 2008, another incident occurred when a patient complained that Plaintiff was not wearing gloves during a procedure. Plaintiff was terminated on September 30, 2008, based upon these incidents." (Pl.'s Resp. Br. at 21).

Defendant's documentation regarding the July 29, 2008 incident is attached as the first two pages of Defendant's Exhibit 13. Redman took the complaint from the patient and completed this statement, which states in pertinent part:

> I received a phone call from Erin Wesley asking me if I could speak with a patient who was crying to our front office staff, very upset about her Nuc. Med. experience. I walked up to the office and there was a patient standing near our double doors very visibly upset (eyes all red, shaking slightly). I asked Amanda her name and if this was the patient that was upset and she said yes. I walked up to the patient [redacted to remove name] and introduced myself and walked her down to sit with me in my office. She immediately started crying and apologized for crying, I handed her some Kleenex and she took a few deep breaths and began explaining to me her bad experiences over the last few days in the Nuc. Med. department.
> . . . .
> The patient said she rescheduled for today and once again Prem was the tech. and brought her back and drew blood from her without washing his hands or wearing

6

gloves.  She expressed to me that this last incident of not wearing gloves just
made her an emotional wreck because she has an infection in her knee where she
has had a total knee replacement and for him to put her at risk with not wearing
gloves was just totally upsetting to her. . . .

(Def.'s Ex. 13).  Plaintiff acknowledges that the patient's complaint, filed on July 30, 2008, was

provided to him.  (Def. and Pl.'s Stmts. at ¶ 43; Def.'s Ex. 13).

Defendant's documentation regarding the September 25, 2008 complaint is attached as

Defendant's Exhibit 14.  Redman took the complaint from the patient and completed this

statement, which states in pertinent part:

> 8:10 am - Linda Cooley came into my office and told me there was a
> patient that was very upset in the waiting room and wanted to talk to the Manager
> or Director of the Department.  His name is Lawrence Zdanio.  Prem Bhama was
> also standing at my door and stated, "I want to show you what I did."  I said "Is
> this a patient from nuclear medicine?"  Linda stated yes as we proceeded to walk
> down to Nuclear Medicine.  Prem was trying to explain something about a cotton
> ball and I stopped him and said I will talk to you later about this I need to talk to
> the patient right now.  Linda Cooley said I will go get him right now and bring
> him into your office.
>
> Mr. Zdanio sat down and said I don't know how you guys can run a place
> like this with characters like that in your nuclear medicine department. . . . Mr.
> Zdanio then stated:  I registered this morning and everything went beautiful there.
> Staff was friendly.  Until I showed up in your department.  The larger foreign guy
> in pink pants shows up . . . .  Once again not saying anything and I had to ask him
> do you want me to get up on the table.  He stated yes.  After I was on the table for
> a few minutes he told me to sit up.  I sat up and he told me to sit in the chair.  I sat
> in the chair next to a waste paper basket that was against the wall.  I looked at the
> wall and it was full of blood splatter and the wastepaper basket was soaked with
> blood.  I looked at the table that was next to my chair that had syringes on it (a lab
> table) and there was a cotton ball soaked with blood laying there.  I asked him
> "what the heck is that" and he proceeded to just pick up the soaked cotton ball
> with his hand (not wearing gloves) and also wadded up the diaper looking pad it
> was on and threw it in the blood soaked waste basket.
>
> He then picked up the syringes that were obviously going to be used for
> me and uncapped one as he was going to start my injection.  That is when I had
> had enough of this treatment.  The guy just picked up a cottonball soaked in
> blood, threw it in the wastebasket that was soaked in blood, along with the wall
> and was going to do an injection on me.  This is absolutely ridiculous that a

hospital is run like this.  I will never come here again.  I will not take the risk of
having someone like that touching me again.
        I told Mr. Zdanio that this matter will be investigated.  I apologized to him
and told him this type of behavior is unacceptable. He gave me his phone number.
I placed a Midas Entry and also notified Sharon Roggelin of the incident.  I was
able to view the wall and the garbage can in Nuclear Medicine and the wall was
blood spattered and the garbage can was blood splattered also.  Linda Cooley also
witnessed the blood on wall and garbage can.

(Def.'s Ex. 14 at 1-3).  Plaintiff admits that "Redman inspected the room and confirmed that

there was blood on the wall and in the wastepaper basket."  (Def. and Pl.'s Stmts. at ¶ 52).

A "Record of Documented Counseling" relating to the incident is included in Defendant's

Exhibit 14.  That document reiterated the above complaint and indicated that Plaintiff was being

terminated.  (Def.'s Ex. 14 at 4).  Plaintiff signed the form, stating, "I do not agree with the above

statement. [illegible] is the past of continued harassment I am facing from Mrs. Cindy Miller.

She has threatened."  (*Id*).  It is undisputed that Defendant terminated Plaintiff's employment on

September 30, 2008.

Following his dismissal, Plaintiff filed another internal complaint, requesting Defendant's

Dispute Resolution Process and seeking reinstatement.  (Def.'s Ex. 15).  Plaintiff's statement

submitted in connection with that request acknowledges: 1) that a patient did in fact make a

complaint about him on September 25, 2008, asserting that Plaintiff failed to follow infection

control practices; 2) that Defendant investigated the incident and discussed it with Plaintiff; and

3) Defendant ultimately did not believe Plaintiff's side of the story and determined that a

violation had occurred.

8

ANALYSIS

I.    Should Plaintiff's Retaliation And Wrongful Termination Claims Be Dismissed For
      Failure To File An EEOC Charge On Those Issues?

Defendant contends that Plaintiff's claim that he was terminated in retaliation for having complained about discrimination must be dismissed because he did not exhaust his administrative remedies by filing an EEOC charge with respect to that claim.  Defendant relies on *Ang v. Proctor & Gamble Co.*, 932 F.2d 540, 545 (6th Cir. 1991).

In response, Plaintiff asserts that the very case cited by Defendant establishes that "in stating a claim of retaliation which stems from a discrimination complaint which has been previously brought before the EEOC does not have to be the subject of a separate EEOC filing." (Pl.'s Resp. at 31).

The Court shall deny this ground for relief.  "In order for federal courts to have subject matter jurisdiction of Title VII claims, the claimant must first unsuccessfully pursue administrative relief."  *Ang*, 932 F.2d at 545.  "Courts have thus held that if the claimant did not first present a claim to the Equal Employment Opportunity Commission (EEOC), that claim may not be brought before the court."  *Id*.  "The judicial complaint must be limited 'to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'"  *Id*. (quoting *EEOC v. Bailey Co., Inc*., 563 F.2d 439, 446 (6th Cir. 1977)).

"Courts have held that retaliation growing out of the EEOC charge is reasonably foreseeable and therefore a plaintiff is not required to file yet another EEOC charge."  *Scott v. Eastman Chemical Co.*, 275 Fed.Appx. 466, 474 (6th Cir. 2008).  The Sixth Circuit explained the rationale for that conclusion in *Ang*:

9

> Courts have held "that it is unnecessary for a plaintiff to exhaust administrative remedies prior to urging a retaliation claim growing out of an earlier charge; the district court has ancillary jurisdiction to hear such a claim when it grows out of an administrative charge that is properly before the court.: *Gupta v. East Texas State Univ.*, 654 F.2d 411, 414 (5th Cir. 1981); *See also Baker v. Buckeye Celluslose Corp.*, 856 F.2d 167, 168-69 (11th Cir. 1988). Because retaliation claims, by definition, arise after the filing of the EEOC charge, this rule promotes efficiency by requiring only one filing. *Id.*

*Ang*, 932 F.2d at 546-47. The court further explained that "[r]etaliatory conduct occurring prior to the filing of the EEOC complaint is distinguishable from conduct occurring afterwards as no unnecessary double filing is required by demanding that plaintiffs allege retaliation in the original complaint." *Id.* at 547.

The Sixth Circuit affirmed the trial court's dismissal of the plaintiff's retaliation complaint in *Ang* because the alleged retaliatory conduct occurred *prior* to the plaintiff's filing of his EEOC charge and "thus could have been alleged in the original charge." *Id.*

Here, in contrast, the alleged retaliation occurred *after* Plaintiff had filed his EEOC charge:

> 14.    Immediately subsequent to filing a charge of discrimination and the filing of the within lawsuit, the Plaintiff was routinely harassed by agents of the Defendant. Further, on September 30, 2008, the Plaintiff was terminated from his position. Said harassment and termination was a direct and proximate cause of having filed a charge of discrimination with the EEOC and having filed the instant cause of action.

(First Am. Compl. at ¶ 14). Accordingly, the Court concludes that Plaintiff was not required to file yet another EEOC charge.

II.    <u>Plaintiff's Discrimination Claims:</u>

"Plaintiff has filed a claim for age, sex and national origin discrimination related to his rejection for the positions of Nuclear Medicine Lead Technologist and Special Imaging

Manager." (Pl.'s Resp. Br. at 23).

At the summary judgment stage, a plaintiff must adduce either direct or circumstantial evidence to prevail on his discrimination claims. *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004).

Direct evidence is evidence that is free of inferences and that, if believed, requires a finding that "unlawful discrimination was at least a motivating factor in the employer's actions. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). "It does not require the fact finder to draw any inferences to reach that conclusion. *Id*. Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.* "Once the plaintiff has produced credible direct evidence, the burden shifts to the employer to show that it would have taken the employment action of which the plaintiff complains even in the absence of discrimination." *White v. Columbus Metropolitan Housing Auth*., 429 F.3d 232, 238 (6th Cir. 2005).

"When a plaintiff proceeds on her claim using circumstantial evidence, she bears the burden of establishing a *prima facie* claim of discrimination using the tripartite *McDonnell-Douglas*[1] framework." *White,* 429 F.3d at 238. Once the plaintiff establishes a prima facie claim, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the employment decision at issue. *Id*. If the defendant is able to meet this burden, the plaintiff must establish that the defendant's stated reason is mere pretext for its true discriminatory motives. *Id.*

A.      Has Plaintiff Come Forward With Direct Evidence Of Discrimination?

Plaintiff contends that he has direct evidence to support his age discrimination claim.

_____

[1]*McDonnell-Douglas Corp. v. Green,* 411 U.S. 792 (1973).

(Pl.'s Br. at 24).  First, Plaintiff notes that, when interviewing Plaintiff for the Nuclear Medicine

Lead Technologist position, Vallejo wrote "only plans on working for 5 more years" on the

interview form and put a star next to that statement.  (Def.'s Ex. 8).  The note in question was

listed below the following question posed to the applicant, "Tell me a little about yourself and

then describe your previous work experience."  (*Id*.).  Second, Plaintiff points the Court to the

following portion of Mr. Vallejo's deposition transcript, where he was asked about that note:

> Q.   I see, and this is all in your handwriting, is that right?
> A.   Yes, it is.
> Q.   You see number two, the star?
> A.   Uh-huh.
> Q.   What does that say afterwards, after the star?
> A.   He only plans to work for five years, for the next five years.
> Q.   Is that what he said?
> A.   Yes, if I wrote it down it would have been what he said at that time.
> Q.   Why is there a star by that?
> A.   Based on my experience, I would have starred it because if they were
>        looking for a long time candidate, we would have asked the question why
>        he wanted to stay with us for five years in reference to a job hopper or
>        somebody who is looking to just promote themselves and move on.
> Q.   Have anything to do with his age?
> A.   I did not know his age at the time so I would not --
> Q.   If you look at him he's got gray hair.  I mean, would that be a concern to
>        you?
> A.   No, I've had gray hair before so no.
> Q.   You have?
> A.   Yeah.
> Q.   I doubt it.  In any event, that's why it's starred, is that your point?
> A.   Exactly, so I put a star.

(Vallejo Dep. at 10-11).   Plaintiff asserts that "[b]ased on Mr. Vallejo's testimony, it is obvious

that the panel was 'looking for a long-term candidate', which obviously means a younger

candidate and, consequently, means that age was an important consideration in the selection

process."  (Pl.'s Br. at 13).

12

In response, Defendant asserts that Vallejo's "written note that Plaintiff planned to work for five more years, is at best ambiguous and not indicative of age discrimination." (Def.'s Reply at 2). Defendant states that the "note was simply a recording of Plaintiff's volunteered statement made in response to a standard Human Resource script." (*Id.*). Defendant contends that the evidence relied on by Plaintiff is not direct evidence because it is not evidence that, if believed, requires the conclusion that unlawful discrimination was a motivating factor in the employer's decision.

The Court concludes that the evidence presented by Plaintiff is not direct evidence of age discrimination. As stated *supra*, direct evidence is evidence that is free of inferences and that, if believed, *requires* a finding that "unlawful discrimination was at least a motivating factor in the employer's actions. *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006). Evidence of discrimination is not considered direct evidence unless an unlawful motivation is explicitly expressed. *Id.* For example, a facially discriminatory employment policy or a corporate decision maker's express statement to remove employees in the protected groups is direct evidence. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

Such evidence was found to exist in *Johnson v. Univ. of Cincinnati*, 215 F.3d 561 (6th Cir. 2000), where the university president allegedly said that "[w]e already have two black vice presidents. I can't bring in a black provost." Those comments were found to constitute direct evidence of discrimination because they required no inference to conclude that racial consideration motivated, at least in part, the employment decision at issue.

Direct evidence of discrimination was also found to exist in *Diaz v. City of Inkster*, 2006 WL 2192929 (E.D. Mich. 2006), where the plaintiff alleged that he was discriminated against on

13

the basis of race.   In that case, the plaintiff offered testimony that the City Manager had said that there were some "members on the council that wanted a black chief" and "when [the current police chief] retires, you can bet the next chief is going to be black."  *Id.* at *9.  The court concluded that the comments of that decision-maker constituted direct evidence because they expressed that race was a determining factor in the employment decision at issue.

This Court found direct evidence of age discrimination to exist in *Parker v. Charter Township of Redford*, 2007 WL 1675219 (E.D. Mich. 2007).  In that case, the plaintiff presented evidence to establish that Mr. Handy was the decision-maker with respect to the plaintiff's termination.  Plaintiff also submitted evidence to establish that Mr. Handy, during a break from the township meeting in which the plaintiff's position had been discussed, said that the plaintiff "is old, he's been here to[o] long, it's time for him to go, he needs to get out and make room for a younger man."   This Court concluded that the comments, which were related to the employment decision at issue and made by the person who made the decision, would constitute direct evidence of age discrimination if believed by the jury.

Unlike the plaintiffs in those cases, Plaintiff has not submitted any evidence in this case that, **"***is free of inferences and that, if believed, requires a finding that unlawful discrimination was at least a motivating factor in the employer's actions***."**  *Amini v. Oberlin College*, 440 F.3d 350, 359 (6th Cir. 2006)(emphasis added).   For Plaintiff to support his case using direct evidence of discrimination, he cannot rely on the fact finder to draw *any inferences* to reach the conclusion that age, race and/or national origin discrimination was the motivation behind the reassignment.  *Nguyen*, 229 F.3d at 563; *Amini,* 440 F.3d at 359; *Blair*, 505 F.3d at 524-25. While the evidence submitted by Plaintiff may possibly favor Plaintiff's age discrimination

14

claim, an inference would nevertheless be required.  The Court therefore concludes that Plaintiff has not met his burden via direct evidence.

Plaintiff must therefore establish a prima facie case under the circumstantial evidence approach.

> B.    Can Plaintiff Establish A Prima Facie Case Of Age, Sex, Or National Origin Discrimination?

Again, "Plaintiff has filed a claim for age, sex and national origin discrimination related to his rejection for the positions of Nuclear Medicine Lead Technologist and Special Imaging Manager." (Pl.'s Resp. Br. at 23).  Both parties agreed at the June 11, 2009 hearing that Plaintiff asserts "failure to promote claims" in this action.

The Sixth Circuit has held that "a plaintiff with a discrimination claim based on a failure to promote must demonstrate" that: 1) he is a member of a protected class; 2) he applied for and was qualified for a promotion; 3) he was considered for and was denied the promotion; and 4) an "individual of similar qualifications who was not a member of the protected class received the job at the time plaintiff's request for the promotion was denied."  *White v. Columbus Metropolitan Housing Auth.*, 429 F.3d 232, 240 (6th Cir. 2005); *Nguyen v. City of Cleveland*, 229 F.3d 559, 562-63 (6th Cir. 2000); *Brown v. City of Cleveland*, 294 Fed. Appx. 226, 231, 2008 WL 4372950 (6th Cir. 2008).  Although neither party cited that authority or applied that particular prima facie case in their initial briefs, both parties agreed at the June 11, 2009 hearing that Plaintiff satisfies the first three prongs.  Thus, the only dispute between the parties, as to whether Plaintiff can establish a prima facie failure to promote claim, is whether Plaintiff can satisfy the fourth prong.

15

In *White,* the Sixth Circuit explained that "in order to satisfy the fourth prong of the prima facie burden in a failure to promote case, it is incumbent upon the plaintiff to establish that []he and the non-protected person who ultimately was hired for the desired position had similar qualifications." *White*, 429 F.3d at 242.

On June 11, 2009, the Court ordered the parties to submit supplemental briefs addressing this fourth prong with respect to each of the two positions that Plaintiff sought. Having reviewed the supplemental briefing on this issue, the Court concludes that Plaintiff has produced sufficient evidence to establish an issue of fact as to the fourth prong with respect to both positions. For example, with respect to the Lead Nuclear Medicine Technologist position, both Plaintiff and Ms. Wesley were Certified Nuclear Medicine Technologists with prior work experience in Nuclear Medicine.

Accordingly, the Court concludes that Plaintiff has established a prima facie failure to promote claim.

D.    Can Plaintiff Establish A Prima Facie Claim Of Retaliation?

The parties agree that in order to establish a prima facie claim of retaliation, Plaintiff must establish the following: 1) that Plaintiff engaged in a protected activity; 2) that Defendant was aware of that protected activity; 3) that Plaintiff suffered an adverse employment action; and 4) there was a causal connection between Plaintiff's protected activity and the adverse employment action.

The first element is established because Plaintiff engaged in "protected activity" in that he: 1) filed an internal complaint of discrimination on April 3, 2007; 2) filed an EEOC complaint; and 3) filed this action alleging discrimination. There appears to be no dispute that

16

Defendant was aware of that activity and that Plaintiff suffered an adverse employment action in that he was terminated. Thus, the second and third elements are also established.

Defendant asserts that Plaintiff cannot establish the final element – a causal connection between Plaintiff's protected activity and the adverse employment action.  Defendant states that the mere fact that an adverse action occurred after a charge of discrimination, standing alone, is insufficient to establish this element.

In his response, Plaintiff recognizes that he needs to come forward with some additional evidence in addition to mere temporal proximity.  He states the following in attempting to do so:

> In this case, the initial protected activity began on April 3, when the Plaintiff filed his employee complaint, outlining illegal discrimination.  Two weeks after there was a decision on that matter, Plaintiff's supervisor told him that she ". . . knew how to handle you people." when he complained about not getting his promotion. Less than two weeks after that, the Defendant's employees began collecting negative information about the Plaintiff ". . . that (they) may need in the future. . .".  Finally, over a year later, the Defendant decided to act.  A reasonable juror could infer from this evidence that the Defendant was formulating a retaliatory plan to discharge the Plaintiff from the very beginning, by their action, and that Cindy Miller finally got to "handle" the Plaintiff by terminating him.

(Pl.'s Br. at 32).

On page 20 of Plaintiff's brief he claims that at one point after he was denied the promotions and complained about it, on June 13, 2007,[2] Plaintiff and another employee (Iyengar) were called into Miller's office and that "She told Plaintiff and Mr. Iyengar, who had been complaining about their rejections for the promotions, that they better shut up and '. . . I know how to handle you people.'"  Although Plaintiff did not identify such evidence in the record,

---

[2]Defendant's internal Dispute Resolution Committee denied Plaintiff's internal complaint on June 11, 2007, and upheld the decision to award the position to Erin Wesley.  (Ex. 11 to Def.'s Br.).

Plaintiff's entire deposition transcript is in the record (Def.'s Ex. 1) and the Court has located the

testimony it believes Plaintiff is referring to:

> A.  Okay.  June 13, '07 or '08 Ms. Miller pulled me and Mr. Iyengar in their office, and Dianna Redman was with her.  Ms. Miller was doing all the talking and she said she didn't like our attitude, that I'm complaining.
> Q.  Okay.
> A.  That what, the promotion and all those thing and if you have to talk we should talk to her directly. . . .
> . . . .
> Q.  I want to find out what was said in the meeting with Cindy Miller.
> A.  She said I know how to handle you people.
> Q.  And she said she didn't like your attitude?
> A.  She didn't like my attitude and if you don't shut up I know how to handle you people.
> Q.  Did she say what she meant by you people?
> A.  Yeah.
> Q.  What did she say?
> A.  Yeah.
> Q.  What did she say?
> A.  That's right, she said I know how to handle you people, people like you.
> Q.  Right, but did she say people like you?
> A.  Yeah, people like you, addressing me and Mr. Iyengar.[3]
> Q.  Did she say what she mean by people like you?
> A.  No, she didn't say that, anything.
> Q.  And she told you she didn't like your attitude since you didn't get the promotion?
> A.  That you are complaining here and there.
> . . . .
> Q.  And she says she doesn't like your attitude since you didn't get the promotion, correct?
> A.  No, she didn't say since you didn't get the promotion, your complaining something.
> Q.  And she said she doesn't like your complaining?
> A.  Yeah.
> Q.  And she says if you don't shut up I know how to handle people like you?
> A.  Yeah.

(Pl.'s Dep. at 119-122).

_____

[3]Mr. Iyengar also filed an EEOC complaint and civil action.

18

The Court concludes that Plaintiff has submitted sufficient evidence of a causal connection to survive summary judgment.  In addition to temporal proximity (i.e., that Plaintiff's termination occurred after his protected activity), Plaintiff testified about the above meeting with Miller and Redman.  Plaintiff testified that during that meeting, which occurred just two days after Plaintiff's internal complaint of discrimination was addressed, Miller told Plaintiff and another employee who had filed a similar discrimination claim, that she did not like their complaining and that if they did not shut up she knew "how to handle people like you."

Accordingly, the Court concludes that Plaintiff has established a prima facie claim of retaliation.

E.    Can Plaintiff Establish Pretext?

Once a plaintiff establishes a prima facie claim of discrimination or retaliation, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for the challenged employment decision.  If the defendant can articulate such a reason, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the defendant's proffered reason is, in fact, pretextual.  *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000).  Moreover, where more than one such reason is proffered, it is Plaintiff's burden "to show that *each* proffered reason is merely a pretext for illegal discrimination.  *Kestner v. Stanton Group, Inc.*, 202 Fed.Appx. 56 at *4 (6th Cir. 2006) (emphasis added).

A plaintiff who is trying to show that his employer's stated reasons for the challenged action are pretextual is required to present evidence that establishes, by a preponderance of the evidence, that the stated reasons: 1) had no basis in fact; 2) did not actually motivate the employer's action; or 3) were insufficient to motivate the action.  *Niswander v. Cincinnati Ins.*

19

*Co.*, 529 F.3d 714, 728 (6th Cir. 2008) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29

F.3d 1078, 1084 (6th Cir. 1994)).

Here, Plaintiff's discrimination and retaliation claims involve the following challenged

employment actions: 1) selecting Wesley for the Nuclear Medicine Technologist position over

Plaintiff due to discrimination based upon age, gender and national origin; 2) selecting Palmatier

for the Special Imaging Manager position over Plaintiff due to discrimination based upon

national origin discrimination; and 3) terminating Plaintiff's employment in retaliation for having

complained about discrimination.  As stated below, Defendant has articulated different

legitimate, non-discriminatory reasons for these challenged actions.

      1.     <u>Choosing Wesley And Palmatier For The Promotions Plaintiff Sought</u>:

Plaintiff's failure-to-promote claims are based on the challenged actions of: 1) selecting

Wesley for the Nuclear Medicine Lead Technologist position and; 2) selecting Palmatier for the

Special Imaging Manager position.

Defendant states that its legitimate, non-discriminatory reasons for choosing Wesley and

Palmatier for these positions over Plaintiff were that: 1) Wesley "enthusiastically outlined her

plans for improving the nuclear medicine department during her interview;" 2) Miller and

Redman "believed that [Wesley] could bring innovative ideas to the Nuclear Medicine

department;" 3) Palmatier "previously demonstrated that he could competently perform as the

Special Imaging Manager;" 4) "Plaintiff had a documented history of ineffective

communication:"; 5)"Plaintiff received numerous complaints from colleagues and patients;" 6)

"Plaintiff had difficulty getting along with Nuclear Medicine personnel; 7) "Miller and Redman

had personal knowledge regarding Plaintiff's ineffective communication and inability to work as

a team;" and 8) "Plaintiff failed to reassure either [Miller or Redman] during his interview that he could improve his communication skills and become an effective manager." (Def.'s Br. at 18-19).

Because Plaintiff's Response Brief failed to address the bulk of those proffered reasons, the Court ordered supplemental briefing on this issue and instructed Plaintiff to file a "brief that *individually addresses* each of the 8 non-discriminatory reasons that Defendant proffered as to why Plaintiff did not receive the promotions at issue." (Docket Entry No. 38). The order further provided:

> The brief should address each reason in a separate section and with respect to each reason, Plaintiff must: 1) identify which of the three methods for showing pretext the Plaintiff relies on; and 2) then identify all record evidence that Plaintiff relies on to establish pretext. Plaintiff's brief shall be no more than 8 pages. Defendant may file a brief of equal length by **July 9, 2009.**

(*Id*.).

Plaintiff submitted a supplemental brief, in which he states that Defendant's proffered reasons for selecting Wesley and Palmatier for the positions over Plaintiff are pretextual because those reasons have *no basis in fact*. (*See* Docket Entry No. 39). That is, Plaintiff does not assert that Defendant's stated reasons are pretextual because they did not actually motivate Defendant's actions or were insufficient to motivate the actions.

As an initial matter, although this Court's June 11, 2009 Order instructed Plaintiff to address each of the eight reasons proffered by Defendant for selecting Wesley and Palmatier for the positions over Plaintiff, Plaintiff did not address several of Defendant's stated reasons. For example, Plaintiff produced no evidence to dispute the factual basis of Defendant's stated reason that Palmatier was selected over Plaintiff because Palmatier had previously demonstrated that he

21

could competently perform as the Special Imaging Manager when he successfully performed in that position on an interim basis.  Plaintiff also failed to produce any evidence to establish that Defendant's stated reason of selecting Wesley for the position because she enthusiastically outlined her plans for improving the department during her interview was without a basis in fact. Because it is Plaintiff's burden "to show that *each* proffered reason is merely a pretext for illegal discrimination, *Kestner*, 202 Fed.Appx. 56 at *4, the Court concludes that Plaintiff has failed to meet his burden of establishing pretext.

Moreover, even with respect to those proffered reasons that Plaintiff did address, the Court concludes that he has failed to meet his burden.  For example, one of Defendant's proffered reasons for not selecting Plaintiff for the positions was that "Plaintiff had a documented history of ineffective communication" and Defendant submitted evidence to support that proffered reason.

In attempting to establish that reason as pretextual because it has no basis in fact, Plaintiff asserts:

> While there is no specific category in the Employee Performance Evaluations relating to communication skills, several nebulous comments were made by Plaintiff's supervisor relating to continuing to keep lines of communication open and that Plaintiff's goal should be to improve communications, there is absolutely no indication in his performance reviews that he did not have effective communication skills, nor is such the case.  There is no basis in fact to the effect that Plaintiff failed to demonstrate effective communication skills or that would have been specifically mentioned in his performance evaluations in specific terms.

(Pl.'s Supp. Br. at 6).

Contrary to Plaintiff's assertions, Plaintiffs written evaluations criticize his communication skills and identify them as an area needing improvement.  For example, one of

22

Plaintiff's written evaluations stated "Prem must strive to improve and increase communications with his fellow techs.  Increase dialogue and overall interactions so his actions are not misconstrued.  Create an[] atmosphere where people can approach him more freely to avoid being misunderstood."  (Def.'s Ex. 3 at 2).  Another written evaluation stated that "Prem needs to keep the lines of communication open between himself and supervisor and coworkers to avoid potential misunderstandings."  (Def.'s Ex. 3 at 13).  Plaintiff responded to that particular criticism in writing.  (*Id*. at 15).  Other criticisms of Plaintiff's communication skills in his written evaluations include:  1) "Prem's bedside manner is commendable, however, not all patients appreciate his comments and joking manner.  He needs to use his judgment when interacting with patients as to whether or not they are going to be receptive to his comments and comments about a patient breaking the floor (should they fall) are NOT appropriate and should be totally avoided."  (Def.'s Ex. 3 at 7); and 2) "Prem needs to continue to keep the lines of communications open between himself and his supervisor and co-workers to avoid any potential misunderstandings or concerns as to what has been done or needs to be done."  (Def.'s Ex. at 7)

Accordingly, the Court concludes that Plaintiff has failed to meet his burden of establishing, by a preponderance of the evidence, that Defendant's proffered reasons are a pretext for illegal discrimination because they are without a basis in fact.  Defendant is therefore entitled to summary judgment with respect to Counts I and II.

2.    Terminating Plaintiff's Employment:

Plaintiff's retaliation claim is based on the challenged action of terminating Plaintiff's employment.  Defendant states that its legitimate, non-discriminatory reason for terminating Plaintiff on September 30, 2008, is as follows: "Plaintiff was given multiple counselings,

23

warnings and disciplines regarding his inappropriate infection-control procedures and interaction with patients. Upon receiving a corroborated complaint from a patient who had Plaintiff attempt to draw his blood in a bloody exam room without wearing gloves and without explaining what was happening, [Defendant] decided that it reached its threshold of tolerance and decided to terminate Plaintiff." (Def.'s Br. at 19). Thus, Defendant contends that it terminated Plaintiff in response to receiving serious infection-control complaints about Plaintiff from patients.

In response, Plaintiff states that "[i]t is uncontested that the Plaintiff was terminated for his alleged failure to wear gloves and wash his hands on several occasions during the late summer and early fall of 2008 (Plaintiff denies all allegations regarding a failure to wear gloves). While the Defendant sets forth the patients' complaints, those complaints are not admissible evidence, as they are hearsay and not admissible." (Pl.'s Br. at 33). Plaintiff further states that "Defendant obviously is attempting to introduce the patient's statements to prove that the Plaintiff didn't wear gloves and didn't wash his hands to justify his termination. The Defendant has refused to disclose the patient's names[4] who made the complaint and has not listed those patients on their witness list." (*Id.*).

In its Reply Brief, Defendant states that it is not using the complaints for the truth of the matter asserted. Rather, it contends that it relies on the complaints to show that there was, in fact, a series of complaints by patients filed against Plaintiff. Defendant states that both Miller and Redman believed these complaints to be dependable, corroborated and credible and note that Plaintiff does not dispute that the complaints were actually made by patients, that the Hospital

---

[4]The Court notes that the name of the patient making the complaint on September 25, 2008 complaint was contained in Redman's statement, which was provided to Plaintiff. (*See* Def.'s Ex. 14 at ¶ 1).

received the complaint or that patients' complaints are a legitimate cause for concern for Defendant.  Therefore, Defendant asserts that Plaintiff cannot establish pretext.  (Def.'s Reply Br. at 6).

The Court concludes that Plaintiff has failed to show that the stated reason for his termination was pretextual.  Notably, Plaintiff does not dispute that Defendant: 1) actually received infection-control complaints about him from patients, 2) investigated those complaints, and 3) ultimately terminated him for those complaints.  Rather, Plaintiff attempts to establish pretext by simply denying the underlying conduct in the patient complaints.  Even if the decision to terminate Plaintiff for the infection-control complaints made by patients ultimately proved to be flawed, however, Plaintiff has failed to show the presence of a genuine issue of material fact regarding Defendant's honest belief that Plaintiff violated Defendant's infection-control procedures.

As long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect.  *See Niswander*, 529 F.3d at 728.  Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action.  *Id.; see also Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998); *Kestner, supra*, at 60-61.  Plaintiff has provided no evidence to rebut Defendant's evidence that Plaintiff was terminated because his supervisors reasonably believed that he had violated Defendant's infection-control policies and procedures.

Accordingly, Defendant is entitled to summary judgment with respect to Count III.

CONCLUSION & ORDER

For the reasons set forth above, IT IS ORDERED that Defendant's Motion for Summary

Judgment is GRANTED.

IT IS SO ORDERED.

S/Sean F. Cox
Sean F. Cox
United States District Judge

Dated:  August 20, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on
August 20, 2009, by electronic and/or ordinary mail.

S/Jennifer Hernandez
Case Manager

26